# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1885-24
            A-1886-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

F.K. and J.L.,[1]

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.L.,
a minor.

_____

      Argued October 21, 2025 – Decided January 15, 2026

      Before Judges DeAlmeida and Torregrossa-O'Connor.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0011-25.

---

[1] We use initials and pseudonyms to protect the parties' privacy. R. 1:38-3(d)(12).

Ryan T. Clark, Designated Counsel, argued the cause for appellant F.K. in A-1885-24 (Jennifer Nicole Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Caitlin A. McLaughlin, Designated Counsel, argued the cause for appellant J.L. in A-1886-24 (Jennifer Nicole Sellitti, Public Defender, attorney; Caitlin A. McLaughlin, on the briefs).

Julia B. Colonna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor K.L. (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendant F.K., the biological mother of K.L., born in December 2020, appeals from the February 10, 2025 judgment of the Family Part terminating her parental rights to K.L. She contends the court erred in finding the New Jersey Division of Child Protection and Permanency (Division) proved by clear and convincing evidence prongs one, two, and four of N.J.S.A. 30:4C-15.1(a)'s test to determine whether termination is in the best interests of the child.

A-1885-24

Defendant J.L., K.L.'s biological father, also appeals from the order terminating his parental rights. J.L. contends the Division failed to prove by clear and convincing evidence all four prongs required for termination under N.J.S.A. 30:4C-15.1(a).

The respective law guardians on appeal support the terminations regarding both parents, as they did before the trial court. Based on our review of the record and applicable law, we are satisfied the record supports the court's decision to terminate both defendants' parental rights. We affirm.

I.

The trial in this matter followed extensive Division involvement with defendants concerning the care and safety of their young son, K.L. The following condensed history is derived from the Division's records admitted at trial, and trial testimony from the Division's expert psychologist, a Division caseworker, and the resource parent, F.K.'s aunt, W.B. Defendants did not appear for or present evidence at trial.

Defendants, the married parents of K.L., first became known to the Division in October 2020, upon a referral reporting F.K. was using methamphetamines while pregnant with K.L. K.L. was born two months later without medical issues, and the Division closed its investigation.

A-1885-24

Division records reveal a series of incidents followed. Division contact sheets indicated in June 2021, "[J.L.] was found slumped over [in] his vehicle. The vehicle was parked. . . . Drug paraphernalia was found in the car . . . . There was a crack pipe and needle found as well. He was charged with possession in the [thi]rd degree." One month later, "[a] report [came in to] police of an unconscious person at a [convenience store]," and "[J.L.] was arrested for having [nine] plastic baggies with a white rock[-]like substance. There was also a hypodermic needle." Two months later, "[F.K.] reported her vehicle stolen and it was later found that [J.L.] had stolen the vehicle. [J.L.] then had an accident with the vehicle and the vehicle was towed."[2]

On October 5, 2021, the Division received a referral that J.L. was outside of a gas station panhandling with K.L. J.L. reportedly "looked awful" and was "holding a baby in his arms 'like a football' and going up to cars asking for money." Division workers visited defendants at their mobile home in Atlantic County later that day. Division workers performed a safety assessment, and K.L. appeared "clean and well cared for." They found "all of the necessary baby items" and noted "no concerns" in the home, which also contained "ample food."

---

[2] The trial court noted these early incidents, but clarified its primary focus was the time period after emergency removal of the child in March 2023.

At the time, F.K. and J.L. both acknowledged their prior substance abuse histories, including their respective participation in Recovery Court. F.K. denied any current drug use, but explained J.L. relapsed in June. She stated she would never leave the baby with J.L. under the influence. Defendants later tested negative for substances, and the Division again closed the matter.

The next Division referral came on March 13, 2023, when a neighbor reported J.L. was passed out behind the wheel of his truck while the truck was running. The neighbor also advised of suspected heroin use by both F.K. and J.L. Division workers went to defendants' home in Atlantic County and discovered K.L. had been staying with W.B. and her husband, J.B. F.K. and J.L. stated they were living in Gloucester County with F.K.'s grandfather while renovating their trailer, which they rented. Defendants indicated K.L. could not return home until these improvements were made. They claimed they were last in drug treatment in 2021.

W.B. confirmed she and J.B. had been caring for K.L. in their home five days a week, and defendants would "pick [K.L.] up for a day or two." She indicated they previously cared for K.L. in 2021 when J.L.'s drug addiction led J.L. and F.K. to leave New Jersey. Division reports reflected K.L. appeared

A-1885-24

well-nourished, and his great aunt and uncle provided an "abundant amount of toys and educational things for K[.L.]"

Both defendants then tested positive for fentanyl and THC and refused to agree to a family safety plan. Consequently, the Division effectuated an emergency removal of K.L. The court granted the Division custody and ordered defendants submit to drug testing and treatment, but allowed defendants liberal supervised visitation with K.L. The child remained in the care of his great aunt and uncle. Division visits with the child while in their care revealed he remained happy, healthy, and affectionate towards W.B. and J.B.

Defendants repeatedly tested positive for fentanyl in April and May of 2023, and never complied with additional testing. F.K. underwent a substance abuse evaluation, which recommended intensive outpatient treatment she never completed. Neither defendant participated in drug treatment or parenting services after K.L.'s removal.

Defendants attended visits with K.L. throughout 2023, with some interruptions. Initially, supervised visits took place at W.B.'s home, but Division records noted defendants appeared inconsistently and sometimes unannounced and objected to W.B. and J.B.'s supervision of their visits. In

A-1885-24

October 2023, discord between W.B. and defendants resulted in an altercation and the location for supervised visits was changed to the Division's offices.

Records noted a December 2023 visit, when J.L. began shouting at a worker and refused to take a urine test, requiring security to intervene. Consequently, the site for future visits was moved so that security could be present. Defendants missed five weeks of visits, and Division records note, after February 2024, defendants showed up consistently late. Efforts at conducting drug testing and securing consistent treatment were similarly unsuccessful, despite the Division's willingness to transport defendants.

Division records memorialized positive interactions between defendants and K.L. Reports noted F.K. was affectionate towards K.L. and brought toys for the child, and J.L. similarly made K.L. feel "comfortable," changing his diaper and playing during their interactions. However, in March 2024, although the court did not approve the Division's plan to proceed with terminating defendants' parental rights, the court found neither defendant had been compliant with court-ordered drug treatment or testing, and housing remained unsuitable for reunification.

A-1885-24

J.L. suffered a hand injury in early 2024, requiring hospitalization and treatment. He claimed this interfered with his ability to comply with court orders and services.

Defendants eventually submitted to psychological evaluations conducted by Dr. Gregory Gambone in June 2024. Dr. Gambone's report indicated he found no major intellectual deficits, but diagnosed each with substance use disorders and resistance to treatment and recommended defendants attend substance abuse evaluations, parenting skills classes, and individual therapy.[3] Dr. Gambone opined J.L. "should not currently be considered capable of adequately parenting his son . . . on an independent basis." The doctor reported J.L. possessed only "a superficial understanding of the physical, emotional, intellectual and social needs of h[is] son," had been "unwilling or unable to consistently meet the parenting needs of his son," but he remained "willing to participate in recommended training and treatment services." The report detailed necessary services and treatment that would have to be completed based on the evaluation before any unsupervised contact could be safely assumed.

---

[3] Although Dr. Gambone's report was admitted at trial, the parties and the court agreed the court would consider it for the purpose of identifying the resulting recommended treatment and services for each defendant, not for any expert opinion. We similarly note its contents for context only regarding those recommendations.

A-1885-24

Dr. Gambone similarly reported F.K. as "unwilling or unable" to meet her son's "parenting needs," but "willing to participate in recommended training and treatment services." The doctor recommended "unsupervised contact [with K.L.] be contingent on [F.K.'s] successful completion of services . . . . [C]onsiderations of reunification should be accompanied by services . . . and should take into account [F.K.'s] treatment progress, continued sobriety, and compliance with all services provided by the Division."

The Division officially commenced its action to terminate defendants' parental rights and filed for guardianship of K.L. on July 10, 2024. The court again ordered defendants submit to urine screens, hair follicle tests, evaluations, parenting skills classes, and therapy.

After repeatedly canceling appointments, defendants each submitted to psychological evaluations in October 2024 conducted by clinical and forensic psychologist Dr. James Loving. Dr. Loving reported F.K. appeared alert and oriented, expressed "[n]ormal" thought content and processes; however, demonstrated "[l]imited" insight and "[p]oor" judgment. The doctor indicated F.K. engaged in "blame-shifting," and "was defensive and lacking in candor about the details of her drug use." F.K. admitted the trailer remained unsuitable for K.L.'s return.

A-1885-24

As to J.L., Dr. Loving reported he admitted to "struggling with relapses over recent months." The doctor indicated J.L. was not compliant with drug screens since the positive tests in early 2023, noting J.L.'s treatment for a hand injury from February 2024 to April 2024. J.L. expressed pessimism to Dr. Loving concerning reunification and presented with "defensiveness" throughout the evaluation. J.L. claimed he did not perceive any issue with housing and indicated the trailer was a safe environment for K.L.

As to both parents, Dr. Loving gave "a very poor prognosis for achieving safe reunification within the foreseeable future." Accordingly, the doctor reported he "support[ed] the Division's goal of adoption for [K.L.] by his current caregivers," citing the nineteen months since removal, during which both parents "almost entirely" failed to comply with services and Division efforts.

By this time, defendants reported living at their trailer in Atlantic County, and the Division arranged for services in Atlantic County, provided bus passes, and offered transportation to services and screenings. Defendants canceled and did not reschedule a home inspection. They claimed a prior attorney advised them not to submit to drug testing, but they were now willing to undergo an evaluation, yet failed to comply. The court ordered a hair follicle test for

October 2024, for which the Division offered door-to-door transport, but defendants did not attend.

Visitation continued, but Division staff noted defendants appeared disheveled and at times exuded a strong odor. Division workers documented their suspicion defendants used fentanyl during visitation, describing defendants disappearing into the bathroom for ten minutes and appearing "dazed" upon return. Staff noted instances of defendants "nodding off" after long trips to the bathroom during visits with K.L. They reported F.K. slurring her words and appearing unsteady on her feet, and J.L. pacing with dilated pupils.

Trial took place on February 10, 2025, and the testimony corroborated the Division records, which were also admitted on that date. W.B. testified K.L. lived with her and her husband "off and on" from the time he was four months old. She indicated her desire to adopt then-four-year-old K.L. to afford stability for the child. Specifically, W.B. explained defendants "had a long history of drug abuse." She stated defendants "have never done anything to show any effort that they are willing to adjust their lives and we just feel that K.[L.] deserves the stability, the love, the selflessness that my husband and I can provide and have always provided for him."

A-1885-24

She recounted Division workers discussing possible permanency plans, explaining "KLG [(Kinship Legal Guardianship)] versus adoption," and providing all the necessary information to understand the difference. W.B. acknowledged KLG kept parental rights intact, noting "[defendants] would remain [K.L.'s] parents and [W.B. and her] husband . . . would just become his legal guardians." She described adoption as "completely terminat[ing]" defendants' parental rights and making W.B. and her husband K.L.'s parents. She testified she would never consider KLG in these circumstances.

Dr. Loving next testified regarding his recent psychological evaluations of both defendants. He described his evaluation as a "risk assessment" for the purpose of identifying "barriers to reunification" and providing a "prognosis or likelihood of being able to achieve successful reunification in the foreseeable future."[4] He reviewed the Division's records, conducted clinical interviews for approximately two hours discussing with each defendant "the [Division] situation," "parenting issues," and "background issues," and performed "psychological testing." He narrated the family's history, and noted defendants'

---

[4] The parties stipulated to Dr. Loving's credentials and expertise in the field of clinical and forensic psychology based on his approximately 3,800 psychological evaluations, including evaluations for parenting capacity, parent-child relationships, and bonding and attachment.

acknowledgment of their substance abuse, their prior positive drug testing, and their "noncomplian[ce] with everything except supervised visits with K.[L.]"

Dr. Loving testified defendants engaged in supervised visits with K.L. with "mixed" results. He cited defendants' exhibiting "signs of substance abuse" and "being under the influence" during the visits, but generating "no[] concerns with their interactions with K.[L.]"

He described F.K. as "cooperative" but "difficult to believe." He testified she denied drug use at the times of the various referrals. She advised her attorney told her not to comply with the court-ordered testing after she tested positive for fentanyl in the first three months after K.L.'s removal. She also contended any positive fentanyl tests were "false positives." As for treatment, F.K. claimed the programs and providers obstructed her ability to comply.

The doctor identified three main concerns regarding F.K.: her drug use and failure to comply with treatment programs, her husband's drug use, and the lack of suitable housing for K.L. Regarding housing, Dr. Loving explained that F.K. expressed a desire to perform renovations to the trailer defendants rented in Atlantic County, but claimed despite the long period of time that had passed, "they ha[d not] been able to complete those renovations." She told Dr. Loving the work remained uncompleted, and the trailer's condition, including exposed

13

wiring, rendered the premises unsuitable for K.L.'s safe return. Because defendants had not permitted inspection of the premises, the doctor relied on F.K.'s representations that she could not offer a "safe living arrangement . . . for K.[L.]" and found "just a poor likelihood that [F.K. was] going to take the steps necessary in the foreseeable future to make sure that her home is safe and healthy for K.[L.] in order to be able to reunify."

Dr. Loving diagnosed F.K. with "opioid use disorder," and found "there's been evidence of more recent drug use than what she reports." F.K., then age thirty, admitted to "extensive substance use back to about age [eighteen] . . . throughout her adulthood." The doctor testified F.K. confirmed she had conflicts with W.B. and J.B., characterizing them as trying to take the child from her.

Dr. Loving described J.L. and F.K. as "extremely similar," but emphasized he evaluated each distinctively and separately; and, despite coming to similar conclusions about each, explained he did not employ a "cookie cutter" assessment of them collectively. The doctor testified J.L., like F.K., stopped complying with drug testing after repeatedly testing positive for fentanyl up until June 2023. J.L. also claimed these results were "false positives." J.L. communicated "there[ was] only so much he was going to cooperate with,"

14

indicating defendants "stopped complying because of frustration with the false positives." The doctor found J.L. "defensive" and attributing the lack of treatment to the providers and the Division, as well as his hand injury.

Dr. Loving diagnosed J.L. with severe opioid usage disorder, cocaine use disorder, and "adjustment disorder with anxiety and depression," all untreated. He testified J.L. had admitted some recent substance relapses. Despite his lack of treatment, J.L. told Dr. Loving he believed the child should be returned to his care. Dr. Loving explained J.L., unlike F.K., identified the "only barrier" to K.L.'s coming home was "mov[ing] some boxes around," and claimed defendants "remedied all of the major concerns." Dr. Loving concluded that J.L. presented the same three main issues presented by F.K. and opined J.L. had a "poor prognosis" for addressing his condition or the risks to K.L. in the future.

Ultimately, Dr. Loving testified reunification of defendants with K.L. remained unsafe. He found intolerable the "obvious risks" involved when opioid-addicted parents care for a child, particularly when the drug at issue is fentanyl. The doctor explained fentanyl use not only impedes defendants' ability to safely care for and supervise the young child, but its mere presence in the home risks his welfare from accidental contact with the substance. Additionally, Dr. Loving concluded that future reunification was unlikely due to defendants'

15

"poor prognosis for change." As such, Dr. Loving recommended execution of the Division's permanency plan to have K.L. adopted by his great aunt and uncle, W.B. and J.B., with whom the young child had resided at least since his removal nearly two years earlier.

Dr. Loving further emphasized he would not support reunification even if W.B. and J.B. were unwilling to adopt or care for him. The doctor indicated he was not asked to conduct a bonding evaluation. He described "only positive collateral input about how K.[L. was] doing and his resource parents' commitment to adoption," but opined "even if that were off the table, this is just not a safe situation for reunification now or in the foreseeable future." He explained, "kids need permanency. So, K.[L.], who has been in placement as long as he has, needs to settle into a home that's permanent."

The court asked the doctor whether defendants had complied with the court's most recent order to submit to hair follicle testing. Dr. Loving responded they had not, and indicated their most recent failure to test factored into his conclusion their future compliance with testing and services remained unlikely. The doctor also cited Division reports of defendants appearing under the influence at visits, citing F.K.'s nodding off, J.L.'s demeanor, their unkempt appearances, and "track marks" on their arms.

16

Division caseworker Diana Blocker then testified, first authenticating the Division records related to the family. She testified regarding the Division's history with defendants dating back to the report in October 2020 regarding F.K. abusing methamphetamines while pregnant with K.L. She explained F.K. refused services, and because there were no children in defendants' care, the Division closed the investigation.

The caseworker explained the Division's efforts upon the referral in March 2023, raising concerns about both defendants' drug use. She indicated defendants tested positive, but refused treatment and would not agree to a safety plan. When the Division learned K.L. was primarily residing at W.B.'s home, and they confirmed his safety in W.B. and J.B.'s care, the Division proceeded with emergency removal. She learned K.L. had been with his maternal great aunt and uncle "for the majority of his life on and off." She described the child as well cared for and the home as "licensed."

Blocker confirmed F.K. submitted to only an initial substance abuse evaluation upon K.L.'s removal, which resulted in recommended intensive outpatient treatment, with which F.K. never complied. F.K. only completed four drug screens after K.L.'s removal, and each was positive for fentanyl.

Regarding the Division's attempts to secure treatment for F.K., Blocker testified about various efforts, including referring F.K. to Helping Hand, a drug treatment center. However, Helping Hand terminated involvement because F.K. missed three appointments. Blocker recounted the history of missed appointments and defendants' failure to attend evaluations and testing, which comported with the Division records. She described the recent efforts made by the Division to conduct court-ordered hair follicle testing for both defendants at a location in Burlington County, including providing "door-to-door" transportation to and from, but advised defendants did not cooperate.

The caseworker testified J.L. never completed a substance abuse evaluation despite his positive testing, and likewise ceased compliance with recommended services. Helping Hand similarly terminated its attempts to engage J.L. J.L. refused to submit to any drug screens, despite repeated notifications and orders. She indicated neither defendant complied with the services recommendations of Dr. Gambone.

Blocker testified about visitation, describing the transition from supervised visits in W.B.'s home to professional supervised visits. She confirmed defendants sporadically failed to appear, but were otherwise consistent in appearing—F.K. more than J.L.

18

She described staff suspicions defendants were at times using substances or under the influence, noting their hygiene issues and behavior, including,

> nodding out, falling asleep during the visits, periods of going in and out of the visitation, whether it be in the office . . . or the visitation room and then they'd be in the bathroom for periods of time and then would come back out and have that affect.

She recounted times the visits were terminated due to these observations, which caused J.L. to become argumentative, and led to the need for security.

She indicated defendants refused to comply or thwarted all Division attempts to assess the condition of the home. She detailed both defendants' noncompliance with treatment and testing, the accommodations made by the Division including offers of transportation, and the supervised visitation sessions. Blocker described advising defendants repeatedly regarding the importance of their compliance, but "they think it's ridiculous. They don't really feel the need to." When they claim the distance is too far, transportation is refused. She quoted J.L. as recently stating, "I just am not doing it."

Blocker represented defendants were told and understood the Division was seeking termination of their parental rights and were advised of the trial date. She indicated she attempted to provide defendants with transportation to the trial, but F.K. declined, and in a group text with J.L., indicated she "wasn't

19

coming." Blocker added that F.K. "had some not so nice words for [her], and she indicated that she was just going to forfeit her rights."

Blocker testified she observed K.L. in the home with W.B. and J.B. "multiple times." She described K.L. as a "typical toddler," "very energetic" and "very affectionate towards" them. She elaborated, "If he's crying, he will seek them for comfort and kind of, you know, solace. . . . [T]hey have a daughter . . . that resides in the home who he also has a close relationship with, as well. He . . . appears happy and just silly and energetic and all those things." She emphasized defendants sought to have K.L. placed with W.B. and J.B. upon his removal. She noted K.L. has no special needs, and his needs are being met in the home.

Blocker explained she discussed adoption versus KLG with W.B. and J.B., indicating the Division had no preference. The resource parents indicated no interest in KLG, noting "safety concerns" regarding defendants, although they maintain relationships with other common relatives, including J.L.'s mother.

Defendants' attorneys' brief closing arguments focused solely on claiming the Division failed to make reasonable efforts to provide convenient services in proximity to defendants' Atlantic County residence. The Division and the Law Guardian argued the Division met the burden of satisfying all four prongs of

20

N.J.S.A. 30:4C-15.1(a), as to each defendant, and termination was necessary and in the best interest of K.L.

After a three-hour recess to review the matter, the court rendered an oral decision and entered a corresponding order granting the Division's guardianship application and terminating both defendants' parental rights.

The court commenced its oral findings, noting defendants' absence from trial despite proper service of the guardianship complaint and notice of the proceeding. The court noted K.L., age four, resided with his maternal great aunt and uncle "off and on" from the time he was "only a few months old."

The court then identified the applicable law and legal standards, and performed its analysis under the standard set forth in N.J.S.A. 30:4C-15.1(a).

As to prong one, whether the child's safety has been or will continue to be endangered by the parental relationship, the trial court cited defendants' substance abuse and inadequate housing. As to defendants' substance abuse, the trial court found "an irresistible inference" "that [defendants] were using and continue to use fentanyl unabated despite what they had been telling others." The court emphasized defendants' testing positive for fentanyl and subsequently refusing further testing. The trial court noted, "when months add up to months after months of just . . . not presenting yourself for a variety of reasons, at some

21

point in time, that turns into . . . the equivalent of positive findings."  Further, the trial court rejected F.K.'s claim that she tested positive for fentanyl due to laced marijuana because she later tested positive for only fentanyl.

The trial court found Dr. Loving "very credible" in his opinion that "neither [defendant] in the reasonably foreseeable future will be in a position for reunification" because "[b]oth suffer from severe opioid use disorder and [J.L.] also having an additional mental health diagnosis."  The court found persuasive Dr. Loving's concerns regarding defendants' failure to submit to testing or treatment and his equating such noncompliance to positive substance abuse findings.  The court noted defendants made no effort to abate concerns.

The court then noted, regarding "the housing issue," F.K. told Dr. Loving "the home was not yet appropriate for bringing the child home for reunification." And, although J.L. said the home would be ready after cleaning up "some boxed personal effects," "the fact that [defendants] did not with a clear singular voice say that they were ready, willing and able to take the child home in terms of adequate housing speaks loudly," leading the court to find "[defendants] don't have a viable plan for reunification."

Consequently, the court found K.L.'s "safety, health or development has been or will continue to be endangered by the parental relationship."  Further,

the court credited W.B.'s testimony "that [defendants] have never shown any effort to address their substance abuse issues," and agreed defendants "simply show no inclination or motivation to do the things necessary to stop the cycle of substance abuse and to prioritize raising their child."

As to the second prong, whether the parents are unwilling or unable to eliminate the harm facing the child, the court noted, "it is difficult to impossible when it comes to substance abuse to definitively delineate between unwilling and unable," and "there comes a point in time . . . where being unwilling turns into unable." The court cited Division efforts to provide services and gain compliance, but found, "[t]hroughout the duration of this case," defendants "expressed that they did not want to use the Division's service," and "[a]t no time between March of 2023 and today did [defendants] take advantage of the numerous opportunities they had to address their substance use issues." The court again noted Division efforts, indicating "transportation" to "paid for" treatment was available but "they simply didn't do it." Thus, the court found defendants refused to eliminate the risk of harm to the child.

As to the third prong—whether the Division made reasonable efforts to provide services to assist defendants in correcting the circumstances which led to the child's placement outside of the home, and whether there are viable

A-1885-24

alternatives to termination of parental rights—the court first found the Division showed reasonable efforts, reviewing the history. The court rejected claims the services were geographically prohibitive, noting the Division offered transportation. The court found the Division "offered portal-to-portal transportation" and "bus passes" so that defendants could comply, and "[t]ransportation was a non-issue." The court thus concluded that the Division "did exercise reasonable efforts" and facilitated defendants' ability to comply with services to no avail.

Regarding viable alternatives to termination, the court noted that, as to the "differences between KLG and adoption," W.B. "was very clear in her testimony that the only one of those two alternatives she would consider is adoption." The court found W.B. "impress[ive]" and "forthright" in her testimony. The court credited "[W.B.]'s relationship and knowledge with respect to [defendants] and how they had acted since they took official custody," and her testimony "they were not willing to participat[e] in a KLG relationship." The court continued, "in this particular case, it is a relative who is the placement. The child was well-acquainted with them before the removal even took place. It's a natural location for the child." Accordingly, the court found "there's no basis to hold[-]up termination of parental rights because KLG is a theoretical possibility."

24

The court specifically concluded "delay of placement will only add to [the] harm." The court explained "[t]he child has been with . . . the placement for most of his life since he was only four or five months old and increasingly so according to what [it] saw in the exhibits." The court characterized the relationship as beginning when W.B. and J.B. gave defendants "a break;" however, "the break turned into a couple days during the week and, ultimately, it turned into almost the parents were visiting with their own child with the aunt and uncle."

The court further noted defendants had not "shown any inclination whatsoever to seek treatment . . . whether motivated for themselves, each other or the child, they didn't show up for the trial with any sort of plea or plan as to what they intended to do." Consequently, the court found "no justification or . . . benefit" in further delay.

As to the fourth prong—whether termination of parental rights will do more harm than good—the court found the Division "satisfied its burden" because defendants "are at present unable to care for themselves in a minimal fashion and they're not in a position to provide an adequate safe environment to raise their son." The court recognized "there's always a certain amount of harm" attendant to terminating parental rights, noting, "[t]here are things unique that

25

each of these parents have to offer their child." However, the court found the circumstances demonstrated termination will not exact greater harm than good.

The trial court then emphasized it "was very impressed" by W.B. and persuaded "she is in a great position to provide . . . an ongoing home for K.[L.]" The court detailed its reasons for crediting Dr. Loving's opinions and credibility, and likewise found Blocker "highly credible" because "her testimony was [one-hundred] percent consistent with everything [the trial court] saw in the exhibits."

## II.

On appeal, F.K. argues the trial court erred in finding: (1) prong one satisfied because the Division's own investigations revealed no actual harm, either physical or emotional, to K.L.; (2) prong two satisfied because F.K. was initially very responsive to the Division's substance abuse concerns, her psychological evaluation revealed no significant disorders or impairments, and she has demonstrated a willingness to mitigate any alleged harms posed to K.L.; and (3) prong four satisfied because no bonding evaluation was conducted and Division reports depict F.K.'s deep affection and genuine care for K.L.

J.L. argues the court improperly found: (1) prong one satisfied because there was no evidence that J.L. caused any harm to his child and the Division deemed defendants' home appropriate housing for K.L. in 2021; (2) prong two

26

satisfied because J.L. indicated an intent to comply with treatment services during his evaluation with Dr. Loving, and he failed to attend such services based on his attorney's advice and his ongoing health issues; (3) prong three satisfied because the Division required J.L. to attend hair follicle tests, urine screens, and psychological evaluations in a county two hours away from defendants, and ignored requests to relocate; and (4) prong four satisfied because J.L. had a loving relationship with K.L., and the Division offered no evidence or bonding evaluation to support finding termination would not exact more harm than good.

## III.

"Our review of a trial court decision in a termination of parental rights case is limited." N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018) (citing N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "In such cases, the trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence." Ibid. (quoting R.G., 217 N.J. at 552). Accordingly, we give substantial deference to the trial court's opportunity to observe the witnesses first-hand and to evaluate their credibility. R.G., 217 N.J. at 552.

Further, "appellate courts should accord deference to family court

factfinding in recognition of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 518 (App. Div. 2018) (internal quotation marks omitted) (quoting N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365 (2017)). Thus, the trial court's findings of fact are not disturbed unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006). However, "we review the trial court's legal interpretations de novo." N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80-81 (App. Div. 2023); see also R.G., 217 N.J. at 552.

Important constitutional and statutory considerations guide our assessment of F.K.'s and J.L.'s arguments. "Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and limited "by the State's parens patriae responsibility to

protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

To terminate parental rights, the Division must prove, by clear and convincing evidence, four requirements, under N.J.S.A. 30:4C-15.1(a). The four-pronged inquiry "aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility." M.M., 189 N.J. at 280.

N.J.S.A. 30:4C-15.1(a) provides, "The Division shall initiate a petition to terminate parental rights on the grounds of the 'best interests of the child'" if the following grounds are established:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

These four prongs "are not discrete and separate;" they overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018).

"When a biological parent resists termination of his or her parental rights, the [trial] court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." R.L., 388 N.J. Super. at 87. "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

A.

Here, both defendants challenge the trial court's finding under prong one that K.L.'s "safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). A judge "need not wait . . . until a child is actually irreparably impaired by parental

inattention or neglect." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting In re Guardianship of DMH., 161 N.J. 365, 383 (1999)). Further, a finding of harm is not dependent on a predicate finding of abuse or neglect. See N.J. Div. of Youth & Fam. Servs. v. A.P., 408 N.J. Super. 252, 259 (App. Div. 2009). While "a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). In addition, "a parent or guardian's past conduct can be relevant and admissible in determining risk of harm to the child." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010).

"[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." M.M., 189 N.J. at 289. Although drug use, standing alone, is typically insufficient to prove the first prong, N.J. Div. of Youth & Fam. Servs. v. V.Y., 423 N.J. Super. 320, 331-32 (App. Div. 2011), a parent's refusal to participate in treatment for substance abuse or mental health concerns factors into the harm assessment when a child is endangered by the parent's condition, N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 222-23 (App. Div. 2013) ("When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's

31

home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart of the statute has been proven."); see also D.H., 469 N.J. Super. at 133-35 (affirming a finding of harm based on "the mother's mental health problems, the parents' repeated failures to complete certain services reasonably offered by the Division, their inconsistent attendance at visitations, . . . their difficulties with housing despite financial assistance," and admission of marijuana use).

Here, the trial court's finding both defendants placed the child at future risk of harm was grounded in the record. Both defendants admitted to serious and prolonged substance abuse—specifically opioid use. Despite their denials, repeated drug testing for months after K.L.'s removal substantiated their use of fentanyl—a particularly dangerous substance as noted by the trial court. Given defendants' history and positive drug-test results, J.L.'s losing consciousness and relapsing, and other concerns, the court and the Division mandated drug screens, evaluations, treatment, and parenting classes for both parents. However, over the span of nearly two years from K.L.'s removal, neither parent complied. Other than submitting to court-ordered psychological assessments, neither defendant took steps to ameliorate or address the concerns their severe substance abuse risked harm to their child.

A-1885-24

F.K. admitted to drug use while pregnant with K.L. and a long history of substance abuse. She admitted to J.L.'s substance addiction and relapses, requiring K.L. to reside with W.B. and J.B. just months after his birth. F.K. underwent one substance abuse evaluation that recommended treatment, and Dr. Gambone's assessment itemized necessary substance treatment and parenting classes required for her to reunify with K.L. The court mandated treatment and specific testing, but F.K. continuously failed to comply. She also denied her substance use, claiming her tests were "false positives." She advised Dr. Loving the home remained unsafe for K.L., and denied Division attempts to assess its suitability.

J.L. similarly refused to comply throughout the length of the removal. He admitted to Dr. Loving his conscious choice not to engage in services or treatment. His history included reports that he lost consciousness while under the influence; yet, he took no steps to address these issues, even after removal.

The record reflected both defendants participated in visitation with K.L., but even these visits engendered concern when Division workers reported both defendants exhibited signs of drug use during the visits. The court credited Dr. Loving's testimony defendants each demonstrated a "poor prognosis for change" and presented an untenable risk to the child's safety. It also reasonably

33

concluded the housing endangered K.L.'s safety based on F.K.'s admission the home was unsuitable and defendants' refusal to allow the Division to assess the conditions. We are not persuaded the Division's inspection of the trailer in 2021 undermined the court's conclusions. Nevertheless, we are satisfied the court's conclusions related to defendants' drug use and utter noncompliance with testing, services, and treatment sufficiently supported its finding of risk to the child.

Against the backdrop of the Division records and the trial testimony, we perceive no error in the court's finding the Division satisfied prong one, as to both F.K. and J.L. by clear and convincing evidence.

B.

Both defendants similarly challenge the trial court's finding the Division established they are "unwilling or unable to eliminate the harm facing the child or . . . unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). This "second prong of the statutory standard relates to parental unfitness." K.H.O., 161 N.J. at 352.

The Supreme Court has clarified the necessary proof to establish this factor:

34

The State must show not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm. That inquiry is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child. Alternatively, under this second criterion, it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm.

[Id. at 348-49 (citations omitted).]

Courts must assess: (1) whether parents have and are able to sufficiently ameliorate the risk of harm; and (2) if unremedied, whether the delay needed to address and lessen that risk will cause additional harm to the children. See id. at 348. This requirement closely interrelates with the first requirement of the best interests test. See DMH, 161 N.J. at 379 ("While the second prong more directly focuses on conduct that equates with parental unfitness, the two components of the harm requirement, N.J.S.A. 30:4C-15.1(a)(1) and (2)[,] are related to one another, and evidence that supports one informs and may support the other.").

We have outlined in detail both F.K.'s and J.L.'s willful noncompliance, even in the wake of their son's removal. Dr. Loving and the court found F.K.'s

35

denials and excuses unbelievable, and both concluded she was unable or unwilling to engage in the necessary interventions to support safe reunification. Likewise, the court concurred with Dr. Loving that J.L. made no effort to ameliorate concerns or risk. J.L.'s medical concerns arose a year after the child's removal and failed to justify his inaction, which he confirmed to Dr. Loving was his deliberate refusal to comply.

The record amply demonstrated defendants were aware of their obligations to submit to drug screens and assessments and engage in services. They were offered transportation and repeated opportunities to commence cooperation with the Division's efforts. They thwarted efforts to inspect their home. Further, W.B., in close proximity to defendants and aware of their history and conduct, as well as the Division caseworker, testified defendants made no efforts to address their issues. Thus, the court's finding both defendants were unwilling or unable to eliminate their substance abuse issues and barriers to reunification with their son was sufficiently supported in the record.

We recognize, as did the caseworker, Dr. Loving, and the trial court, defendants both participated—although not without issues in both attendance and behavior—in supervised visitation. However, we accept the trial court's determination that this was but one piece of the best interests mosaic, far

36

outweighed by defendants' overwhelming noncompliance as to all other material concerns. Further, the court appropriately noted the visits sparked renewed concerns of drug use by both defendants, which remained unaddressed, despite Division efforts and the court's orders.

Further, we are satisfied the court sufficiently determined a "delay of permanent placement will add to the harm" to K.L. N.J.S.A. 30:4C-15.1(a)(2). The court noted that the matter had been in litigation for nearly two years, K.L. needed a permanent placement, and the record demonstrated neither defendant could care for their child with all of the outstanding concerns. Thus, we see no error in the court's concluding prolonging permanent placement would add to that harm.

C.

Under prong three, the standard is whether "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). This consideration requires the Division to make "reasonable efforts to provide services to help the parents correct the circumstances that led to the child's placement outside the home." M.M., 189 N.J. at 281 (citing N.J.S.A.

30:4C-15.1(a)(3)). "The Division's efforts on behalf of a parent are 'not measured by their success.'" N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 212 (App. Div. 2007) (quoting DMH, 161 N.J. at 393) (finding the Division engaged in reasonable efforts where it "provided substance abuse evaluations, substance abuse referrals, psychological evaluations, daycare assistance, transportation and facilitated the visitation between [defendant] and her sons").

F.K. does not offer, and thus waived, any argument under N.J.S.A. 30:4C-15.1(a)(3). See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505-06 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."). Nonetheless, as we assess J.L.'s argument concerning this prong, we find sufficient evidence in the record to support the trial court's finding the Division made reasonable efforts to address both defendants' issues.

Here, we defer to the trial court's findings that logistics and transportation did not present an impediment to the ample and extensive services offered to both defendants by the Division throughout its involvement. Even as termination and trial loomed, the court ordered testing and opportunities to comply, but defendants took no steps to adhere to those orders or demonstrate even minimal effort to engage. The sheer scope and duration of both defendants'

failure to cooperate undermines defendants' attempts to shift blame for their noncompliance or to tether their failures to specific events, providers, or circumstances. We need not reiterate the pervasive noncompliance; it suffices to conclude the trial court's findings were sufficiently supported by the record and will not be disturbed.

Under the second part of prong three, the trial court is required to "consider[] alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). We are satisfied, as was the trial court, W.B. and J.B. were advised and understood the difference between the two permanency plans. W.B.'s testimony, corroborated by Blocker, showed the resource parents were "absolutely" committed to adoption and opposed to KLG. Given the discord and history between defendants and W.B. and J.B., and safety concerns regarding defendants, we find no error in the trial court's consideration and rejection of KLG as alternative to termination.

D.

Finally, we similarly consider and reject both defendants' challenges to the trial court's findings under prong four that termination of parental rights will not do more harm than good. We recognize "the fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'"

R.G., 217 N.J. at 559 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "The question is 'not whether a [birth] biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent.'" Ibid. (alteration in original) (quoting E.P., 196 N.J. at 108).

This analysis "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, "[t]he question . . . is whether, after considering and balancing the two relationships, . . . child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [the] foster parents." Ibid. Courts have "long considered a child's relationship with the resource family . . . when [it] applie[s] the fourth prong." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 23 (2023).

Both defendants argue the court's expedient and concise determination of this factor was insufficient, and the lack of a bonding evaluation in this case requires remand for an assessment regarding K.L.'s relative attachments to defendants and his resource parents, W.B. and J.B. They argue the court fatally failed to sufficiently consider their attachments to K.L., and his to them, and never assessed the degree of harm termination would cause to K.L.

Vital under prong four is consideration of "[a] child's need for permanency." M.M., 189 N.J. at 281 (citing K.H.O., 161 N.J. at 357-58) "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Critically, children should not "languish indefinitely" in a resource placement while a parent attempts to correct parenting difficulties. S.F., 392 N.J. Super. at 209.

Termination is necessary under certain circumstances to allow children to have a secure and permanent home. See N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 595 (App. Div. 1996). Thus, although bonding evaluations generally inform decisions involving the termination of parental rights, N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 436-37, 440 (App. Div. 2009), they are not compulsory when termination "[i]s not predicated upon bonding, but rather reflect[s the child]'s need for permanency and [the parent]'s inability to care for [the child] in the foreseeable future." B.G.S., 291 N.J. Super. at 593.

Here, despite the absence of a bonding evaluation, we will not disturb the trial court's findings. Dr. Loving opined, the record supported, and the court accepted defendants were unable to care for their son, now or in the foreseeable

41

future.  Their documented drug abuse, positive fentanyl results, and two-year failure to engage in or comply with court-ordered services amply supported the expert determination they were unfit and unmotivated to address their deficits that endangered their son.

We are not persuaded by defendants' arguments the record lacked support for the court's finding K.L. would be less harmed and actually benefit from permanent placement with his great aunt and uncle.  It is undisputed W.B. and J.B. cared for K.L. for well-over half of his young life.  By all accounts he thrived in their care, and defendants even designated these resource parents as the appropriate caregivers upon K.L.'s removal.  W.B. and the Division caseworker testified about the bond between the resource parents and K.L., and the court reasonably concluded permanent placement in their care would be in K.L.'s best interest.  Notably, K.L.'s affectionate visits with defendants were acknowledged by the witnesses and the court, as was the harm that inheres when parental rights are terminated.  Thus, we are satisfied the court considered the entirety of the record—namely the child's interactions with and attachment to his biological parents—in concluding any harm from termination was outweighed by the need for permanency.

We also note Dr. Loving's extensive risk assessment and psychological

42

evaluation of defendants and review of Division records in reaching his opinion defendants could not care safely for their son. The doctor noted the "positive collateral input" as to the bond between K.L. and W.B. and J.B., which Blocker and W.B. confirmed, but concluded, regardless, defendants were unfit and should not be reunified with K.L. under any circumstances.

The court thus found these circumstances warranted termination independent of the relative bonding of defendants and the resource parents with the child, as the risk to the child if returned to defendants was simply too great. It found K.L.'s need for permanency was strong after years of instability. Accordingly, we conclude the court did not abuse its discretion in finding the termination of defendants' parental rights would not exact more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division